IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

# COLDWELL BANKER-HOFFMAN BURKE and DONNA SLINEY, ET AL. v. KRA HOLDINGS, ET AL.

Rule 3 Appeal from the Chancery Court for Shelby County
No. 107899-3     The Honorable D. J. Alissandratos, Chancellor

No. W1999-02721-COA-R3-CV - Decided May 5, 2000

Plaintiff, a licensed affiliate real estate broker, sued to collect a commission for locating a particular property for a prospective buyer. When the sellers refused to sell the property, the prospective buyer abandoned efforts to obtain the property. About six weeks later, the prospective buyer contacted one of the sellers and was able to negotiate with all of the sellers for purchase of the property and ultimately consummated the purchase for a higher sale price than originally contemplated. Plaintiff alleges that she had an oral agreement for $150,000.00 commission, or, alternatively, that she was acting as a facilitator and entitled to a commission for her services as such. From the trial court's order granting summary judgment to defendant, plaintiff has appealed.

**Tenn.R.App.P. 3, Appeal as of Right; Judgment of the Chancery Court affirmed**

CRAWFORD, P.J., W.S., delivered the opinion of the court, in which HIGHERS, J., and FARMER, J., joined.

Rex L. Brasher, Jr., Memphis, For Appellant, Sliney

David J. Harris, Susan M. Clark, Memphis, For Appellees

## OPINION

This is plaintiffs' appeal from the trial court's order granting summary judgment to defendants. In January 1996, the appellant Donna Sliney ("Sliney"), a licensed affiliate real estate broker, and the appellee Ken Anderson ("Anderson") met to discuss Anderson's interest in purchasing a golf course. Sliney advised Anderson that the Farmington Country Club near Memphis might be for sale. Following their initial meeting, Sliney took Anderson on a tour of the Farmington Country Club on January 9, 1996. After the tour, Anderson confirmed to Sliney his intent to purchase the club. Sliney then called David Johnson, a Memphis attorney, and told him about Anderson's interest in purchasing Farmington. Johnson immediately arranged for a meeting that afternoon between himself, Anderson, Anderson's associate Michael Baker, and Russell Bloodworth of the Boyle Investment Company. Farmington was owned by Albert Austin, Lloyd Lovitt and the

Boyle Investment Company.

At the January 9 meeting, Bloodworth informed Anderson that Farmington was not for sale but that he would check with the other owners to see if they had any interest in selling the club. Shortly after the January 9 meeting, Bloodworth informed David Johnson that one of the club's owners was adamantly opposed to selling the club and had instructed Bloodworth not to pursue any offers to buy Farmington. Following this failed attempt, neither Johnson nor Bloodworth had any involvement in the sale of the Farmington club.

Shortly after the first unsuccessful attempt, Sliney inquired of Anderson whether he was still interested in buying Farmington, and she suggested that she arrange a meeting between Anderson and O.W. Winsett, a real estate developer whom she thought might be able to arrange a meeting directly between Anderson and Farmington's owners. On January 15, 1996, Anderson, Sliney, and Michael Baker met with Winsett and William Bartholomew, another local attorney. The parties agreed that Bartholomew would act as a trustee for Anderson, and in that capacity, Bartholomew agreed to deliver to the owners an offer to buy the club for $5 million. Anderson agreed to pay at closing $300,000 to cover fees, commissions and expenses related to the transaction. Sliney stated at the meeting that her commission would be three percent of the sale price or $150,000. Winsett was to have received an equal amount.

Following the January 15 meeting, Bartholomew drafted a sales contract for the purchase of Farmington and he also prepared a Declaration of Trust authorizing Bartholomew to act as trustee for Anderson. The Declaration of Trust provided that Anderson would advance the required earnest money and that he would pay $300,000 at closing to cover fees, commissions, and expenses of the transaction. On January 17, 1996, Anderson and Baker met with Winsett and Bartholomew at which time Anderson signed the Declaration of Trust and wrote the earnest money check to Bartholomew for $250,000.

After the January 17 meeting, Bartholomew called Albert Austin, one of Farmington's owners and told him that he represented a potential buyer. Despite Austin's confirmation that the club was not for sale, Bartholomew delivered the purchase contract to Austin. Austin testified that he never discussed the contract with the other owners because the club was not for sale. During the same time period, Winsett delivered a copy of the contract to John Stone, an employee of Boyle Investment Company, another Farmington owner. Approximately two weeks later, Stone called both Winsett and Bartholomew to inform them that the owners were not interested in selling the Farmington Country Club. On February 8, 1996, Bartholomew returned to Anderson the earnest money check for $250,000. Following the activities of January and February, 1996, Sliney, Bartholomew and Winsett had no further involvement in Anderson's purchase of Farmington. Sliney even stated in her amended complaint that "[O]n or about February 26, 1996, Mr. Anderson informed your parties that he had no further interest in pursuing investment in a golf course."

In March 1996, approximately six weeks after the last failed attempt, Anderson called J. Bayard Boyle, Jr., chairman of the Boyle Investment Company, to inquire whether Anderson could convince Boyle to sell him the Farmington club. On March 28, 1996, Anderson met for lunch with

Bayard Boyle and Lloyd Lovitt, another of the club's owners. At that meeting, Anderson told Boyle and Lovitt that he would pay $5 million for the club. Following a series of telephone conversations over the course of the following two weeks, the owners agreed to sell and Anderson agreed to buy the Farmington club for $5.5 million, ten percent more than his original offer. On April 16, 1996, Anderson formed KRA Holdings, LLC, a limited liability company, to purchase the club. On May 6, 1996, the club's owners and KRA signed a purchase contract, and on June 5, 1996, the transaction closed. None of Farmington's owners ever met with or negotiated with Ms. Sliney, Mr. Winsett, Mr. Hoffman or anyone other than Anderson, his business associate Michael Baker, and his attorney. After purchasing Farmington, Anderson refused to pay Sliney the commission which she demanded.

On July 19, 1996, Donna Sliney and O.W. Winsett filed a complaint in the Chancery Court of Shelby County against KRA Holdings, LLC and Ken R. Anderson. The plaintiffs alleged claims for breach of contract, for quantum meruit, for violation of the Tennessee Consumer Protection Act against Anderson, and for inducement/procurement of breach of a contract against KRA. The plaintiffs filed an amended complaint on July 30, 1996, adding as plaintiffs Coldwell Banker Hoffman-Burke, Inc. and Daniel C. Hoffman, Jr. The record reflects that Sliney was, at all times relevant hereto, a licensed affiliate real estate broker for Coldwell Banker Hoffman-Burke, Inc., and that her managing broker was Daniel C. Hoffman, Jr. On September 6, 1996, the defendants filed an answer and a counterclaim for damages arising from the plaintiffs' allegedly frivolous and meritless lawsuit brought solely for the purpose of harassment.

Following discovery, the defendants on September 30, 1997, filed a motion for summary judgment seeking dismissal of all of the plaintiffs' claims. The defendants argued that the plaintiffs were not entitled to recover damages for nonpayment of the commission because (1) they were not the procuring cause of the sale; (2) Sliney, as an affiliate broker, could not lawfully collect a real estate commission; and (3) Sliney could not act as Anderson's agent in the absence of an agency agreement as required by T.C.A. § 62-13-401.

In response on November 14, 1997, Sliney filed a motion for leave to amend the amended complaint, which the trial court granted on July 23, 1998. In the second amended complaint, Sliney alleged that she was acting in accordance with an oral contract governed by T.C.A. § 62-13-102 pertaining to a "facilitator." Sliney prayed that the trial court find that the parties had an oral contract for a three percent commission and that she be awarded $150,000 or in the alternative that the trial court find that she be entitled to a $150,000 finder's fee based on the parties' oral agreement for a three percent commission. Also, on November 14, 1997, Sliney filed a motion for a partial voluntary non-suit with prejudice in which she sought to relinquish her claims brought under the Tennessee Consumer Protection Act, for inducement/procurement of breach of a contract, for treble damages, punitive damages, and for attorneys' fees. The trial court granted Sliney's motion for partial non-suit with prejudice by order entered on March 11, 1998. By Order entered January 23, 1998, plaintiff O.W. Winsett also took a voluntary non-suit with prejudice as to the foregoing claims.

On September 3, 1998, the trial court entered an order granting summary judgment to defendants as to all claims of plaintiffs Coldwell Banker Hoffman-Burke, Inc., Daniel C. Hoffman, Jr., and O.W. Winsett. The order of dismissal of the foregoing claims was made final pursuant to the express requirements of Rule 54.02 Tenn.R.Civ.P. The trial court's September 3, 1998, order

also granted the defendants' motion for summary judgment as to all claims brought by Donna Sliney "in any capacity except to the extent that she states a claim for remuneration as a 'finder.'"

Following the September 1998 order, both plaintiff Sliney and defendants filed cross motions for summary judgment as to the remaining claims. By an order entered February 16, 1999, the trial court granted defendants' motion for summary judgment and denied plaintiff Sliney's motion. On March 12, 1999, Coldwell Banker Hoffman-Burke, Inc., Daniel C. Hoffman, Jr., and Donna Sliney filed in the trial court a notice of appeal, appealing the order of summary judgment entered February 16, 1999. Plaintiff O.W. Winsett did not file a notice of appeal.

The dispositive issue on appeal is whether the trial court erred in granting summary judgment to defendants. Before discussing this issue, however, we will deal with the defendants' issue asserting that the appeals of Coldwell Banker-Hoffman Burke, Inc, and Daniel C. Hoffman, Jr., are not timely filed.

On September 3, 1998, the trial court's order granted summary judgment to defendants on all claims brought by plaintiffs, Coldwell Banker-Hoffman Burke, Inc., and Daniel C. Hoffman, Jr. The order states in pertinent part:

> IT IS THEREFORE ORDERED ADJUDGED AND DECREED:
>
> 1. That the defendants' Motion for Summary Judgment is granted as to all causes of action brought by the plaintiffs Coldwell Banker Hoffman-Burke, Inc., and Daniel C. Hoffman, Jr. There being no just reason for delay, a final judgment shall be entered against these plaintiffs.

Rule 3, Tenn.R.App.P., providing for an appeal as of right, states as pertinent to the issue before us:

> **Rule 3. Appeal as of Right: Availability; Method of Initiation.** - (a) Availability of Appeal as of Right in Civil Actions. - In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealability as of right. *Except as otherwise permitted in Rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure*, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights, and liabilities of all parties. (Emphiasis added).

Rule 54.02, Tenn.R.Civ.P., provides for making final any order that adjudicates fewer than

all the claims or the rights and liabilities of all the parties:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only **upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment**. In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties. (Emphasis Added).

The September 3, 1998 order was made final pursuant to Rule 54.02, Tenn.R.Civ.P., *see Fox v. Fox*, 657 S.W.2d 747 (Tenn. 1983); thus, notice of appeal by these plaintiffs must have been filed within thirty days thereafter. This Court is prohibited from extending the time allowed for taking an appeal as of right. Rule 2, Tenn.R.App.P.; *Edmundson v. Pratt*, 945 S.W.2d 754 (Tenn. Ct. App. 1996). This Court has no jurisdiction to hear the appeal where the notice of appeal is not timely filed. *Id.* We also note that these appellants have not filed a brief, and the appeal is subject to dismissal upon a motion of the appellees. Rule 29(c), Tenn.R.App.P.

We will now consider plaintiff Sliney's issue. A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 [now Rule 56.06] provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

At all times relevant, Ms. Sliney was an affiliate broker, as that term is defined in T.C.A. § 62-13-102 (2). In *Barden v. Roberts*, No. 94029-2 R.D., 1989 WL 28715 (Tenn. Ct. App. Mar. 29, 1989), this Court held that an affiliate broker lacked standing to sue a property owner for a real estate commission, relying upon the Supreme Court's decision in *Turnblazer v. Smith*, 379 S.W.2d 772 (Tenn. 1964). In *Turnblazer*, our Supreme Court held that a real estate salesman in the employ of a real estate broker had no right to maintain an action in his own name against the broker's client for a commission. In *Barden,* this Court noted that "a comparison of former and current statutes reveals no appreciable difference between a 'real estate salesman' and an 'affiliate broker.' An affiliate broker is still under the direction and control of a licensed broker and engaged by the broker to do his bidding." *Barden*, at *2. The *Barden* Court further noted that the chancellor, allowing the affiliate broker to maintain the action to collect the commission, erroneously relied upon T.C.A. § 62-13-105, which was added to Chapter 13 in 1973. The statute provides:

> **62-13-105. Action by broker to collect compensation.** - No action or suit shall be instituted, nor recovery be had by any person, in any court of this state for compensation for any act done or service rendered, the doing or rendering of which is prohibited under the provisions of this chapter to other than by licensed brokers, affiliate brokers or time-share salespersons, unless such person was duly licensed hereunder as a broker, affiliate broker or time-share salesperson at the time of performing or offering to perform any such act or service, or procuring any promise or contract or the payment of compensation for any such contemplated act or service.

The Court interpreted the statute to require that a license be held as a condition precedent to any affiliate broker or real estate broker maintaining an action for commissions, but the Court reasoned that "this code section does not give an affiliate broker standing to sue the client directly when this standing does not otherwise exist." The *Barden* Court also fortified its interpretation of T.C.A. § 62-13-105, and the Court's reliance upon *Turnblazer,* by a comparative analysis of the disciplinary statute in existence at the time of *Turnblazer* and in existence at the time of the *Barden* decision. Both statutes provide for license revocation or suspension of a real estate salesman (in the former statute) and an affiliate broker (in the present statute) for accepting a commission or valuable consideration, except from the licensed broker by whom he is employed. The *Barden* Court held that an affiliate broker lacks the legal capacity to bring an action directly against the broker's client. The trial court correctly granted summary judgment, because Ms. Sliney may not maintain an action to recover a commission.

Moreover, Ms. Sliney's claim for a fee for a sale of the real estate fails, because there was no written agency agreement. T.C.A. § 62-13-401, as in effect on January 1, 1996 provides:

> A real estate licensee may provide real estate services to any party in a prospective transaction, with or without an agency relationship to one (1) or more parties to the transaction. Until such time as a licensee enters into a specific written agreement to establish an agency relationship with one (1) or more parties to a transaction, such licensee shall be considered a facilitator and shall not be considered an agent or advocate of any party to the transaction. **An agency or subagency relationship shall not be assumed, implied or created without a written bilateral agreement that establishes the terms and conditions of such agency or subagency relationship.**
> (Emphasis Added).

It is undisputed that there was no agency agreement between Anderson and Sliney or any of the brokers at Coldwell Banker-Hoffman Burke, Inc. The only written agreement relied upon by Sliney is the declaration of trust entered into between Anderson and Bartholomew which provides as follows:

> This Agreement made and entered into by and between WILLIAM BARTHOLOMEW, as Trustee, and KEN R. ANDERSON, as Beneficiary,
>
> WITNESSETH:
>
> Beneficiary desires to purchase property and business known as Farmington Country Club, and to assist in this transaction hereby appoints William Bartholomew, Trustee, with full power to execute a contract and other documents for the purchase and sale of said property.
>
> Beneficiary has reviewed and approved said contract for purchase and sale, and agrees to advance the required earnest money and pay the purchase price of $5,000,000.00 provided for in the contract, and, in addition, the closing and adjustment items also provided for.
>
> Beneficiary further agrees to pay at closing $300,000.00 to cover fees, commissions, and expenses of the transaction, to be disbursed through the Trustee.
>
> Trustee declares that he is acting as Trustee in behalf of

Beneficiary, for the use and benefit of Beneficiary, and Trustee shall have no personal liability under the terms and conditions of the contract for purchase and sale, or hereunder.

IN WITNESS WHEREOF, the parties have executed this instrument this 17th day of January, 1996.

The Declaration of Trust authorized only Bartholomew to act on Anderson's behalf and provided for him to distribute fees and commissions. It is undisputed that the transaction contemplated in the Declaration of Trust never materialized and that Bartholomew returned the $250,000.00 earnest money check to Anderson February 8, 1996. There was no further involvement by Bartholomew or anyone else under the terms of the Declaration of Trust. The transaction contemplated by the Declaration of Trust was abandoned when the earnest money was returned, and the parties to this agreement considered the contract to be defunct. *See Jenkins v. Goddard*, No. 03A01-9704-CH-00139, 1997 WL 528921 (Tenn. Ct. App. Aug. 28, 1997).

Even assuming *arguendo* that Sliney could receive a fee for the real estate transaction and that there was an agency contract, there is no evidence in the record that Ms. Sliney was the "procuring cause" of the transaction. In *Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382, 388 (Tenn. Ct. App. 1981), this Court held that a broker "procures" the sale of real property only if the broker "presents a customer able, willing and ready to deal on terms satisfactory to his principal. This is generally evidenced by a written offer on terms previously named by the principal." 635 S.W.2d at 388. The Court further explained:

Appellant seems to conceive that, once an agent has introduced a customer to his principal, he (the agent) thereby has a perpetually vested interest in any transaction taking place between the customer and the principal. Such is not the rule. The rights of the agent are limited to those transactions of which his efforts are found to be the efficient, procuring cause. It does not apply to negotiations instituted in good faith after a substantial delay following a termination of first negotiations.

*Id.* at 389-90.

In *Pacesetter*, the owners had agreed to permit a broker to find a tenant for their property. The broker found a prospective tenant, but negotiations were unsuccessful. Three months later, the owners and the same prospective tenant entered into a lease agreement. In declining to find that the broker was entitled to a commission, the Court held:

If the efforts of a broker have failed to produce a contract, and negotiations have "broken off," it is not "bad faith" or "overreaching" for the seller to respond to later overtures of the buyer without

allowing the broker to participate in the renewed negotiations.

*Id.* at 390.

There is no evidence to demonstrate that Ms. Sliney was the procuring cause of the transaction between Anderson and Farmington's owners. Despite the best efforts of Donna Sliney, O.W. Winsett, David Johnson, and William Bartholomew, they failed to produce an agreement between Anderson and the owners of the Farmington Country Club. Following the activities of January and February, 1996, Donna Sliney had no further involvement in Anderson's purchase of Farmington, and she herself stated in the complaint that Anderson told her in February 1996 that "he had no further interest in pursuing investment in a golf course." Moreover, none of Farmington's owners ever met with or negotiated with Ms. Sliney, Mr. Winsett, or Mr. Hoffmann. Clearly, after the efforts of all others had failed and several weeks had passed during which no further efforts were undertaken by anyone toward the purchase of Farmington, it was Anderson's personal telephone call to Bayard Boyle that ultimately resulted in the agreement to sell the Farmington club. Two weeks following the meeting, Anderson and the owners agreed to the terms of sale whereby Anderson would pay an additional $500,000 or ten percent more than his original offer in order to purchase the club for $5.5 million.

As noted by this Court in ***Robinson v. Kemmons Wilson Realty Co.***, 293 S.W.2d 574, 585 (Tenn. Ct. App. 1956),

> If a broker, after introducing a prospective customer to his employer to no purpose, abandons his employment entirely, or if, after procuring a person who proves to be unwilling to accept the terms of his principal, he merely ceases to make further endeavors to negotiate a deal with that particular individual and all negotiations in that direction are completely broken off and terminated, he will not be entitled to a commission if his employer subsequently renews negotiations with the same person, either directly or through the medium of another agent, and thus effects a sale without further effort of the broker first employed. 8 Am. Jur. *Brokers* § 144, p. 1069.

*Id.* at 585.

Finally, Ms. Sliney alleges that she and Anderson had an oral agreement whereby she would act as a "facilitator" under T.C.A. §62-13-102 and would thereby garner a fee for her work "finding" the Farmington Country Club. Just as there was insufficient evidence to establish an agency contract between Sliney and Anderson, we similarly conclude that the record reflects no agreement whereby Sliney would act as a finder for Anderson for a fee. Even if there had been such an agreement, Ms. Sliney herself stated that "[O]n or about February 26, 1996, Mr. Anderson informed your parties that he had no further interest in pursuing investment in a golf course." It is evident from the record that Ms. Sliney did not "find" a property that was for sale. The first two attempts to purchase the club

had failed because the club was not for sale. In fact, the owners testified that the club was not for sale until after they had met with Anderson who had convinced them to sell.

The record reveals that there was no agreement between Ms. Sliney and Anderson for payment of any fee for "finding" a property. To the contrary, viewing the record as a whole, it reflects that Ms. Sliney's involvement was predicated on her expectation of obtaining a commission as a selling agent. She testified in her deposition: "I know that I was the selling - you know, representing as a selling agent." The sale contemplated in the Declaration of Trust did not materialize, and the right to a commission on the part of the broker failed. Summary judgment terminating the broker's right to a commission terminates any claim by Ms. Sliney.

Accordingly, for the foregoing reasons, the order of the trial court granting summary judgment to defendants is affirmed, and the case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellant, Donna Sliney.